IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUAN PANTOJA,                        )
                                     )
            Plaintiff,               )
                                     )
                                     )
      v.                             )      Case No. 03 C 4961
                                     )
AMERICAN NTN BEARING                 )
MANUFACTURING CORP.,                 )      HONORABLE CHARLES R. NORGLE
                                     )
                                     )
            Defendant.               )

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the court is Defendant's Motion for Summary Judgment brought pursuant to

Federal Rule of Civil Procedure 56(c). For the following reasons, the court grants Defendant's

Motion for Summary Judgment.

## I. BACKGROUND[1]

### A. Facts

This case arises out of an employment dispute between Plaintiff Juan Pantoja ("Pantoja"),

and Defendant American NTN Bearing Manufacturing Corporation ("NTN"). Pantoja was born

in Mexico and is a United States citizen. NTN is an Illinois corporation which owns and

operates a manufacturing plant in Elgin, Illinois. Pantoja worked at NTN from July 1992

through August 30, 2002.

---

[1] The court takes the undisputed facts from the parties' Local Rule 56.1 Statements, and
notes disputed facts within the text.

1

While at NTN, Pantoja held the position of Machine Operator in the Screw Department. By 1997, Pantoja was promoted to Machine Operator, Grade 2. In December 1997 NTN reduced the staff in the Screw Department, and Pantoja was scheduled to lose his job. According to NTN, it was customary to help employees find new positions within the company instead of face termination. NTN offered to transfer Pantoja to the Maintenance Department of the Engineering Division to work as a mechanic. Pantoja accepted the job, and because he had no experience as a mechanic, NTN provided on the job training so Pantoja could fulfill his duties at his new position.

In the Maintenance Department, Pantoja reported to Bob Cloyd ("Cloyd"). Martin Yoshida ("Yoshida") was the manager of the Engineering Division, and had management authority over the Maintenance Department. Cloyd had supervisory authority over all mechanics and janitors in the department. Cloyd trained Pantoja for on the job duties such as recording air compressor and pump pressure readings, changing filters, maintaining and cleaning the compressor rooms, organizing tools and parts, and collecting garbage and cardboard for disposal.

In 1998, NTN hired James Cusimano ("Cusimano") as a janitor in the Maintenance Department. Shortly thereafter, Cloyd observed that Cusimano had the skills and aptitude of a mechanic. Cloyd discovered that Cusimano had 25 years of mechanical and mechanical repair experience. As a result, Cusimano was reassigned as a mechanic in the Maintenance Department. NTN alleges that Cusimano's promotion to mechanic status was the result of his 25 years of work experience as a mechanic and millwright. In September 1998, Cusimano's status at NTN was "M-0" grade mechanic with a pay rate of $11.63 per hour, while Pantoja was also a grade "M-0" mechanic with pay rate of $12.92 per hour.

2

Then, in February 1999, Pantoja was given a raise to $13.29 per hour, while Cusimano received an increase in pay to $12.81 per hour. In February 2000, Pantoja again received a raise to $13.66 per hour, while Cusimano received $13.17 per hour. In April 2000, Pantoja was promoted to the M-1 grade mechanic at a pay rate of $14.47 per hour. Cusimano was also promoted to the M-1 grade mechanic level, and received an hourly rate of $14.18. In October 2001, Pantoja was promoted to the M-3 grade mechanic, and received a raise to $16.70 per hour. Cusimano was promoted to the M-4 grade mechanic, and his pay was increased to $17.77 per hour.

NTN utilized a skill check test to determine whether a mechanic should be promoted to the next grade level. The test was administered by one of the managers or supervisors in the Maintenance Department, which in this case was usually Cloyd. Between September 1998 and August 2002, Pantoja and Cusimano were the only mechanics in the Maintenance Department. Cloyd stated that between early 2001 and September of that year, Cusimano scored higher than Pantoja on the skills check test. According to Cloyd, Pantoja was qualified as an M-3 instead of an M-4 mechanic.

Then, on a date prior to December 31, 2001,[2] NTN alleges that a manager found Pantoja in the Engineering Department's management office alone, an area to which he was not assigned. NTN further alleges that while he was in the office, Pantoja obtained Cusimano's private personnel records and compared them to his own. Upon learning that Cusimano received a promotion, Pantoja complained to the Human Resources department manager Stuart Moir ("Moir"). Then, on February 11, 2002, Cloyd issued Pantoja's performance review for the 2001

---

[2]Neither party's 56.1 Statements cite a specific date for this event.

year. The review stated that Pantoja need improvement in the areas of quality standard compliance and organizational skills. Some of the goals listed on the review included the need to take classes in welding, electricity, and machine shop. According to NTN, Pantoja never took these recommended classes.

NTN has a discipline policy set forth in its employment handbook. A copy of the handbook is given to employees when they are hired, and is available in the Human Resources office. Under the policy, employees are subjected to both oral and written disciplinary action. Written discipline is documented by an Employee Warning Record ("EWR"). An EWR must be approved by both a department manager and the Human Resources Department. Three written disciplines within one year in regards to the same behavior can result in termination of employment. Furthermore, it is NTN's policy that if a particular infraction is serious enough, that can be grounds for termination, regardless of whether three written disciplines have been issued.

On April 2, 2001, Cloyd issued an EWR to Pantoja because Pantoja marked a filter pump as properly maintained for one week, when in reality, he did not perform the required maintenance. According to the EWR, Pantoja's failure to observe a leak resulted in the shut down of production and replacement of the pump's seal. Cloyd stated this EWR was listed as a first oral warning. No further action was taken after the April 2 EWR. Then, on April 9, 2001, Cloyd wrote another EWR on Pantoja for his failure to properly maintain the grinding system, by allowing a week's worth of filter paper to accumulate, thereby causing the system to shut down. On April 17, 2002, Cloyd issued a third EWR on Pantoja, for his failure to change the wash filters. This was designated as an oral warning. Then, on April 23, 2002, Cloyd issued another

4

EWR to Pantoja, which stated that Pantoja had left a cooling tank unattended which resulted in the overfill of water, a waste of coolant and water, and the eventual shutdown of production. This EWR was identified as a first written warning. When Pantoja was informed of the EWR, he indicated that he would attempt to make a better effort to meet Cloyd's expectations. On that same day, Cloyd wrote a note designated a 'verbal warning' indicating that Pantoja was reprimanded for failing to complete a job, and instead engaged in conversation with another employee. Pantoja further admitted that he left the tank area while he was filling it, and forgot to return to shut the valve off.

On August 1, 2002, Cloyd prepared another EWR, which was designated as a second written warning. According to Cloyd, the basis for this EWR was Pantoja's failure to monitor a tank while filling it, which resulted in the overfill of 3000 gallons. Pantoja admits that while he filled the tank, he left to assist on an air compressor repair job and did not return to shut the valve off. The next day, Cloyd drafted a written report in which he alleges that Pantoja was playing pool with another employee during work hours. Then, between August 15 and 26, 2002 Maintenance Department Manager Joe Maney ("Maney") prepared an EWR on Pantoja, due to what Maney believed was Pantoja's failure to maintain oil for a compressor, which caused the compressor to overheat.

On Saturday, August 10, 2002, Pantoja punched into work at 5:00 a.m. At NTN all employees were required to punch in upon reporting to work, and punch out upon leaving. An employee was not allowed to punch in to work, and leave the premises without punching out on his timecard. According to NTN, that is sufficient grounds for termination. During the course of the day, Department Manager Dan Milanovic ("Milanovic") observed Pantoja and another

5

employee in a closed office in the Steel Ball Department. Milanovic informed Maney of the incident that following Monday. When Maney asked Pantoja if anything unusual happened on Saturday, Pantoja stated that Shannon Garcia ("Garcia") had called and asked him to help her fix a flat tire. Pantoja further admitted to leaving the plant without punching out, and that he was gone for twenty minutes. As a result, Maney gave an EWR to Pantoja dated August 26, 2002. Cloyd never signed the EWR, although he was asked to, because, according to Cloyd, he was out of town that day and did not have firsthand knowledge of the incident.

Then, on August 30, 2002, Human Resources Manager Peter Datka ("Datka"), met with Pantoja, Maney, Cloyd, and Yoshida. At the meeting, Pantoja was terminated. Datka told Pantoja that he was discharged from NTN because of previous warnings and for leaving the plant without permission or punching out.

## B. Procedural History

On November 22, 2002, Pantoja filed a Complaint with the EEOC, and received a Notice of Right to Sue on April 21, 2003. Then, on July 18, 2003, Pantoja timely filed his eight-count Complaint in the United States District Court for the Northern District of Illinois. Specifically, Pantoja alleges that NTN discriminated, harassed, and retaliated against him in violation of both § 1981, and Title VII. On June 28, 2005, NTN filed its Motion for Summary Judgment. Pantoja filed his Response on August 3, and NTN Replied on August 17, 2005. NTN's Motion for Summary Judgment is fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is permissible when "there is no genuine issue as to any material fact

6

and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000); see also Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When a party moves for summary judgment, the court must view the record and all inferences in a light most favorable to the non-moving party. Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the non-moving party's favor must be drawn from specific facts identified in the record that support that party's position. See Szymanski, 231 F.3d at 364. Under this standard,

7

"[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

**B. Pantoja's 42 U.S.C. § 1981 and Title VII- 42 U.S.C. § 2000e Claims**

Pantoja's Complaint alleges violations of both § 1981 and Title VII. Because § 1981 claims are evaluated "under the same rubric as Title VII claims, we need not address them separately." Herron v. DaimlerChrysler Corp., 388 F.3d 293, 299 (7th Cir. 2004) (citing Williams v. Waste Mgmt. of Ill., Inc., 361 F.3d 1021, 1028 (7th Cir. 2004)).

Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); see Whittaker v. Northern Illinois University, 424 F.3d 640, 645 (7th Cir. 2005). In order to prevail on a race discrimination claim under Title VII or § 1981, Pantoja must "either show direct evidence of discriminatory motive or intent, or rely on the indirect burden-shifting method outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Bio v. Federal Express Corp., 424 F.3d 593, 596 (7th Cir. 2005); see Hart v. Transit Management of Racine, Inc., 426 F.3d 863, 866 (7th Cir. 2005) (§ 1981 includes prohibition against racial discrimination).

Under the McDonnell Douglas method, a plaintiff who alleges racial discrimination must first establish four elements of a prima facie case: (1) that he is a member of a protected class; (2) that he was meeting his employer's legitimate performance expectations; (3) that he suffered an adverse employment action; and (4) that he was treated less favorably than similarly situated

8

individuals who are not members of his protected class. See Ballance v. City of Springfield, 424 F.3d 614, 617 (7th Cir. 2005); Whittaker, 424 F.3d at 645.

Once the plaintiff has established a prima facie case, the burden shifts to the defendant to provide a legitimate, non discriminatory reason for the adverse employment action. Ballance, 424 F.3d at 617. If the defendant satisfies its burden, the burden shifts back to the plaintiff to show that the defendant's explanation was pretextual. Id, Bio, 424 F.3d at 596. To establish pretext, the plaintiff may show that the reasons given by the employer are factually baseless, were not the actual motivation for the decision, or were insufficient to motivate the decision. Stewart v. Henderson, 207 F.3d 374, 376 (7th Cir. 2000). The failure to establish any one of the initial four prima facie elements defeats a plaintiff's discrimination claim. Id. With these principles in mind, we turn to NTN's Motion for Summary Judgment.

### 1. Pantoja has not established a prima facie case of racial discrimination

Pantoja has not presented the court with any evidence of direct discrimination. "Direct evidence is evidence which in and of itself suggests that someone with managerial authority was 'animated by an illegal employment criterion.'" Walker v. Bd. of Regents of the Univ. of Wisconsin, 410 F.3d 387, 394 (7th Cir. 2005) (quoting Sheehan v. Donlen Corp., 173 F.3d 1039, 1044 (7th Cir. 1999)). Such evidence is typically related to "the motivation of the decisionmaker responsible for the contested decision." Id. This evidence can be "interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." Id. (quoting Troupe v. May Dept. Stores, 20 F.3d 734, 736 (7th Cir. 1994)).

9

In the instant case, Pantoja provides no documents, statements, or other materials that offer direct evidence of discrimination. Therefore, he must proceed under the McDonnell Douglas burden shifting method.

As a preliminary matter, neither party disputes that Pantoja, a Hispanic, is a member of a protected class and that his termination constitutes an adverse employment action. See Whittaker, 424 F.3d at 645; Washington v. Illinois Dept. of Revune, 420 F.3d 658, 659-60 (7th Cir. 2005) (discussion of adverse employment actions). However, the parties disagree as to whether Pantoja had met NTN's legitimate performance expectations, and whether he was treated less favorably than similarly situated individuals who are not members of his protected class.

NTN submits several EWRs that depict Pantoja as a less than diligent employee. According to NTN, Pantoja performed his job in a careless fashion. This carelessness had an adverse effect on the production at the plant. See Def.'s Stmt. of Mat. Facts, ¶¶ 97-120, Ex. 20; see also Pl.'s Stmt. of Mat. Facts, Ex. P. In each of these EWRs, Pantoja acknowledged that he committed errors, and promised to "pay more attention for this [to] not happen again." Pl.'s Stmt. of Mat. Facts, Ex. P. While Pantoja need not prove, at this stage of the litigation, that he performed his job in a satisfactory manner, he must provide the court with some evidence that creates a genuine issue of material fact on the subject. See Heft, 351 F.3d at 283; Thomas, 328 F.3d at 892-93. However, Pantoja is unable to do so.

In his Response, Pantoja states that "spills are a common occurrence." Pl.'s Resp., at 4. However, Pantoja submits no evidence that gives an alternate explanation for the several EWRs NTN issued against him in regard to the spills he caused. Pantoja further states that evidence of

10

hostility towards Hispanics in the form of racial epithets are sufficient to create a genuine issue of material fact. Id. at 9-10. However, these arguments do not address the specific allegations in the EWRs that were given to Pantoja for his several instances of misconduct. As a result, Pantoja "does not advance to the later stages of the analysis, as he cannot show a prima facie case of discrimination." Herron, 388 F.3d at 299-300.

Pantoja's Title VII and § 1981 claims also fail because he cannot satisfy the similarly situated prong of the McDonnell Douglas test. A similarly situated employee "is one who is 'directly comparable to the plaintiff in all material aspects.'" Bio, 424 F.3d at 596 (quoting Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002)); see Walker, 410 F.3d at 396 (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)). To determine whether two employees are similarly situated, the court must "look at all relevant factors, including whether the employees "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications– provided the employer considered these latter factors in making the personnel decision.'" Bio, 424 F.3d at 596 (quoting Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 532 (7th Cir. 2003)). The Seventh Circuit indicates that two employees are similarly situated if "they are directly comparable to [plaintiff] in all material respects." Walker, 410 F.3d at 396 (quoting Patterson, 281 F.3d at 680).

Viewing all of these factors together, Pantoja cannot establish that he and Cusimano are similarly situated for purposes of Title VII and § 1981, and therefore his case is doomed. See Stewart, 207 F.3d at 376; see also Racicot v. Wal-Mat Stores, Inc., 414 F.3d 675, 678 (7th Cir. 2005). First, Cusimano held a different job description than Pantoja; Cusimano was an M-4

grade mechanic, while Pantoja was at an M-3 grade. Second, Pantoja alleges that he and Cusimano were subjected to different standards while at NTN. Specifically, Pantoja claims that "Cusimano caused spills for which he was not disciplined." Pl.'s Resp., at 4; see Pl.'s Stmt. of Mat. Facts, ¶¶ 72-79. However, Pantoja offers no evidence to support his conclusion that Cusimano was not disciplined. Lastly, Cusimano had 25 years of experience as a millwright and mechanic, while Pantoja received on the job training. See Def.'s Stmt. of Mat. Facts, Ex.4. NTN stated that Cusimano's previous work experience was a direct reason for his promotions. See id. In fact, Pantoja had received a higher salary than Cusimano for a majority of the time the two worked together. Therefore, Pantoja has not established that he and Cusimano were comparable in all material aspects, and as a result, his prima facie claim for discrimination fails. See Walker, 410 F.3d at 396; see also Szymanski, 231 F.3d at 364.

### 2. Legitimate Reason for Termination

Even though Pantoja has not established a prima facie case for discrimination under Title VII and § 1981, with an abundance of caution, the court will proceed with the remaining McDonnell Douglas analysis. Assuming, arguendo, that Pantoja has established a prima facie case of discrimination, the burden shifts back to NTN to establish a legitimate, non-discriminatory reason for Pantoja's termination. See Ballance, 424 F.3d at 617. Here, NTN has stated that it fired Pantoja for violation of NTN's employment policies. See Def.'s Mot. for Summ. J., at 4. NTN issued several EWRs and oral warnings to Pantoja for his poor job performance. See id, at 8. In fact, Pantoja admitted that he caused the tank overfills that were reported in the EWRs. Def.'s Stmt. of Mat. Facts, ¶¶ 100, 111. Furthermore, Pantoja admitted that he left the plant on August 10, 2002 without punching out on his timecard. Id; ¶ 149. NTN

12

considered Pantoja's failure to punch out as the "most serious action." Def.'s Mot. for Summ. J., at 9.

There is no evidence in the record to suggest NTN had a discriminatory or illegitimate motive when it terminated Pantoja. As a result of the EWRs and oral warnings issued to Pantoja, NTN has produced "evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Rudin v. Lincoln Land Comm. Coll., 420 F.3d 712, 725 (7th Cir. 2005) (quoting Stockett v. Muncie Indiana Transit Sys., 221 F.3d 997, 1001 (7th Cir. 2000)). As a result, NTN has established a legitimate, non-discriminatory reason for Pantoja's termination for purposes of Title VII or § 1981. See Ballance, 424 F.3d at 617.

### 3. Pretext Argument

Lastly, after NTN has established its legitimate reason for termination, Pantoja is required to show that the proffered reason is pretextual. See Stewart, 207 F.3d at 376; see also Herron, 388 F.3d at 301. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." Stewart, 207 F.3d at 378 (quoting Jackson v. E.J. Brach Corp., 176 F.3d 971, 983 (7th Cir. 1999)). The court will not "sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision." Id. Moreover, it is not sufficient to prove that the reason was doubtful or mistaken. Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1, 147 F.3d 535, 541 (7th Cir. 1998). Pretext does not mean simply a mistake, but instead a lie, "specifically a phony reason for some action." Id. (quoting Johnson v. City of Fort Wayne, 91 F.3d 922, 931 (7th Cir.

13

1996)). The only concern is whether the legitimate reason provided by the employer is in fact an honest one. See Stewart, 207 F.3d at 378.

Pantoja has again submitted no evidence that creates a genuine issue of material fact as to whether NTN's legitimate, non-discriminatory reason for his termination was pretextual. See Jansen v. Packaging Corp. of Amer., 123 F.3d 490, 493 (7th Cir. 1997) (employee presented no evidence that the reasons for termination were mere pretexts, therefore the employer was entitled to summary judgment). Pantoja acknowledged that he was at fault for the overfills, and for not punching out while he left the plant, in each EWR. Not once did Pantoja allege that these EWRs were pretextual, or the result of some sort of discriminatory intent on the part of NTN. Furthermore, in a thirteen-page letter to NTN President Sam Kato ("Kato") written after his termination, Pantoja did not reference any anti-Mexican discrimination on behalf of NTN. See Def.'s Motion for Summ. J., Ex. G. Absent any evidence of discrimination, this court will not comment on the termination procedures at NTN. "A district judge does not sit in a court of industrial relations." Wernsing . Dep. of Human Services, 427 F.3d 466, 468 (7th Cir. 2005) (quoting Pollard v. Rea Magnet Wire Co., 824 F.2d 557, 560-61 (7th Cir. 1987)). "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII and § 1981 do not interfere." Id. Therefore, because Pantoja cannot establish a pretextual reason for his termination, summary judgment is appropriate in favor of NTN as to all of Pantoja's Title VII and § 1981 claims.

## C. Pantoja's Retaliation Claim

In addition to his discrimination claims, Pantoja alleges that NTN violated Title VII and § 1981 when it fired him in retaliation for his complaints of discrimination. See Compl., ¶¶ 24, 39.

14

While retaliation is grounds for relief under Title VII, "§ 1981, in contrast, encompasses only racial discrimination on account of the plaintiff's race and does not include a prohibition against retaliation for opposing racial discrimination." Hart, 426 F.3d at 866. Therefore, the court will only proceed on Pantoja's Title VII retaliatory discharge claim.

Under Title VII, it is "unlawful for any employer to discriminate against an employee for opposing a practice made unlawful by the Act." 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation under the direct method of proof, a plaintiff must establish that: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action subsequent to his participation; and (3) there was a causal link between the adverse action and the protected activity." Dunn v. Nordstrom, Inc., 260 F.3d 778, 784 (7th Cir. 2001). In order to prove a causal link, "the plaintiff is required to show that the employer would not have taken the adverse action 'but for' the plaintiff's engagement in the protected activity." Id (citing McKenzie v. Ill. Dep't of Transp., 92 F.3d 473, 483 (7th Cir. 1996)).

First, Pantoja states that NTN retaliated against him for his oral complaints about discriminatory practices at the plant. See Compl., ¶ 39. NTN, on the other hand, questions whether oral complaints are sufficient to qualify as a "statutorily protected activity." However, the court finds NTN's argument unpersuasive. As the Seventh Circuit has stated, "[A]n employer many not retaliate against an employee who has complained about discrimination or other employment practices that violate Title VII. . . ." Racicot v. Wal-Mart Stores, Inc., 414 F.3d 675, 678 (7th Cir. 2005). Therefore, Pantoja's oral complaints to the Human Resources office are sufficient to satisfy the first prong of his retaliation claim.

15

Second, it is undisputed that Pantoja suffered an adverse employment action as a result of his termination. However, Pantoja cannot establish a causal link between the adverse action and the protected activity under the third prong of the retaliation claim. See id. To establish a causal link, Pantoja must show that NTN fired him as a result of his complaints to Human Resources. See id. NTN has submitted several EWRs that demonstrate Pantoja's inability to perform his job in a satisfactory manner. Furthermore, these EWRs were issued prior to any alleged oral complaint made by Pantoja to the Human Resources department. It is impossible for NTN to retaliate against Pantoja by issuing EWRs in retaliation for complaints Pantoja had yet to make. Therefore, Pantoja cannot establish that NTN retaliated against him through the direct method of proof, and must proceed under the indirect, burden-shifting method.

Under the indirect method, the plaintiff must "establish a prima facie case of retaliation by showing that: (1) she engaged in a statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." Moser v. Indiana Dep't of Corr., 406 F.3d 895, 903 (7th Cir. 2005). Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. See id. Then, if the employer satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual. See Dunn, 260 F.3d at 784.

It has already been determined that Pantoja engaged in a statutorily protected activity and that he did not meet NTN's legitimate expectations. Furthermore, it is undisputed that Pantoja's termination constituted an adverse employment action. Lastly, Pantoja offers no evidence to

establish he and any other employee at NTN were similarly situated for purposes of Title VII. See Walker, 410 F.3d at 396. As a result, Pantoja cannot establish a prima facie of retaliation under the indirect, burden-shifting method.

However, with an abundance of caution, the court will analyze the remainder of Pantoja's retaliation claim. Assuming, arguendo, that Pantoja has established a prima facie case, the burden now shifts to NTN to articulate a legitimate, non-discriminatory reason for the termination. See Moser, 406 F.3d at 904. NTN has stated that it fired Pantoja due to the several EWRs that were given to him for poor job performance, and failure to punch out his time card upon leaving the plant. Pantoja has offered no evidence to create a genuine issue of material fact as to this claim.

Lastly, the burden shifts back to Pantoja to demonstrate that NTN's explanation is pretextual. See Dunn, 260 F.3d at 784. However, Pantoja is unable to proffer any evidence that creates a genuine issue of material fact as to whether NTN's reason was "an honest one." See Stewart, 207 F.3d at 378. Absent any such evidence, Pantoja cannot satisfy this part of the indirect burden-shifting analysis, and summary judgment is proper as to NTN on Pantoja's retaliation claim.

## D. Pantoja's Harassment Claims

Lastly, Pantoja alleges that he was subjected to racial harassment in violation of both Title VII and § 1981. See Compl., ¶¶ 31, 45. Courts have interpreted 42 U.S.C. § 2000e-2(a)(1). to prohibit employers from forcing employees to "work in a discriminatory hostile or abusive environment." Shanoff v. Ill. Dept. of Human Serv., 258 F.3d 696, 701 (7th Cir. 2001) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Workplace discrimination in the form of

17

"'intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'" violates Title VII. Harris, 510 U.S. at 21 (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); see also Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1048 (7th Cir. 2000). "By its terms, this provision of Title VII proscribes only workplace discrimination . . . it is not a 'general civility code' designed to purge the workplace of all boorish or even all harassing conduct." Berry v. Delta Airlines, Inc., 260 F.3d 803, 808 (7th Cir. 2001).

To survive summary judgment on a hostile work environment claim, a plaintiff is "required to establish that: (1) he was subjected to unwelcome harassment, (2) the harassment was based on his race, (3) the harassment was severe and pervasive enough to alter the conditions of his environment and create a hostile and abusive working environment, and (4) there is a basis for employer liability." Beamon v. Marshall & Ilsley Trust Co., 411 F.3d 854, 863 (7th Cir. 2005) (citing Luckie v. Ameritech Corp., 389 F.3d 708, 713 (7th Cir. 2004)). "A plaintiff bringing a hostile environment claim must establish that the workplace was both subjectively and objectively offensive." Ezell v. Potter, 400 F.3d 1041, 1047 (7th Cir. 2005) (citing Rogers v. City of Chicago, 320 F.3d 748, 752 (7th Cir. 2003)). "A workplace is objectively offensive when a reasonable person would find it hostile or abusive considering all the circumstances." Id. Factors relevant to determine whether the workplace is objectively offensive include: "the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Moser, 406 F.3d at, 902 (quoting Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 534 (7th Cir. 1993)). The workplace is "subjectively hostile when the worker

18

actually perceives it as such." Ezell, 400 F.3d at 1048 (citing Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807 (7th Cir. 2000)). "The workplace that is actionable is the one that is hellish." Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997).

In Cerros v. Steel Technologies, Inc., 288 F.3d 1040, 1042 (7th Cir. 2002), the Hispanic plaintiff was referred to as "'brown boy,' 'spic,' [and] 'wetback.'" Id. In addition, "racist graffiti was painted on the bathroom walls. It included racial remarks and symbols such as 'spic,' 'Go Back to Mexico,' 'Tony Cerros is a Spic,' 'KKK,' and 'White Power.'" Id. In Ferguson v. Pipefitters Ass'n Local Union 597, 334 F.3d 656, 658 (7th Cir. 2003), the African American plaintiff was forced to endure graffiti stating "death to all niggers," "Fuck Niggers," a Ku Klux Klan poster hung in a work trailer, and "the display of a hangman's noose." Id. The conduct Pantoja complains of is at worst and isolated incident of insensitivity, and simply does not arise to the required level of severity or pervasiveness.

Furthermore, an employer is liable if either the plaintiff's supervisor created the hostile work environment, Mason v. S. Ill. Univ., 233 F.3d 1036, 1043 (7th Cir. 2000) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998), or a co-worker created the hostile work environment, and the employer was "negligent either in discovering or remedying the harassment." Mason, 233 F.3d at 1043; Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998). With these principles in mind, we turn to Pantoja's hostile work environment claim.

First, Pantoja cannot establish that he was in fact subjected to harassment that a reasonable person would find hostile or abusive. See Ezell, 400 F.3d at 1048; see also Murray v. Chicago Transit Auth., 252 F.2d 880, 889 (7th Cir. 2001) (to be actionable as creating a hostile

19

work environment under Title VII, the conduct must have the purpose of effect of unreasonably interfering with an employee's work performance, or creating an intimidating work environment). Pantoja alleges that he was the victim of unwarranted harassment by virtue of Cusimano's derogatory remark to a co-worker. However, Pantoja does not submit any evidence that these remarks were aimed towards himself; rather, he alleges that other employees were harassed. Pantoja does not establish how he felt intimidated or harassed as a result of this activity. While the Complaint alleges that NTN "allowed a co-worker to repeatedly make derogatory remarks about Mexicans . . . ." Compl., ¶ 45, Pantoja only submits this single incident between a co-worker and Cusimano as evidence of a hostile work environment. A single event is not "pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21. Such evidence is insufficient to establish the first prong of a hostile work environment claim. See Walker v. Mueller Industries, Inc., 408 F.3d 328, 334 (7th Cir. 2005).

Second, Pantoja cannot establish that any alleged harassment was based on race. In his Complaint, Pantoja states that he was harassed when NTN wrote him up for "unwarranted reasons and by allowing a co-worker to repeatedly make derogatory remarks about Hispanics to plaintiff and plaintiff's co-workers." Compl., ¶ 31. Again, Pantoja relies on the one instance where Cusimano made a remark to a co-worker. Pantoja does not submit evidence to show that Cusimano constantly harassed him. Nor does this single incident establish that Cusimano acted with a discriminatory intent. In fact, Pantoja does not submit evidence of any further racist or harassing remarks made by Cusimano after the once incident in question. "An objectively hostile work environment will not be found where the conduct that forms the basis of a claim . . . is

'isolated and not particularly severe.'" Whittaker, 424 F.3d at 645 (quoting Mannie v. Potter, 394 F.3d 977, 983 (7th Cir. 2005)). As a result, Pantoja has not satisfied the second prong of his hostile work environment claim. See Perry, 126 F.3d at 1013.

Third, there is no evidence in the record to suggest that the alleged harassment Pantoja suffered was so pervasive that it altered his work environment. Standing alone, the facts do not support the claim that the work environment at NTN was so "hellish" that Pantoja could not continue to work there. See Walker, 408 F.3d at 333; see also Beamon, 411 F.3d at 863. For instance, Pantoja alleges that because Cloyd wrote several EWRs for infractions Pantoja admitted to, this constitutes an abusive work environment. That does not amount to a hostile work environment, as it is standard operating procedure at NTN to reprimand those employees who commit errors on the job. "A district judge does not sit in a court of industrial relations. . . No matter how medieval a firm's practices . . . Title VII and § 1981 do not interfere." Wernsing, 427 F.3d at 468 (quoting Pollard, 824 F.2d at 560-61). Pantoja has submitted no evidence to demonstrate that EWRs are a direct result of Cloyd's supposed discriminatory beliefs. All NTN employees were subject to EWRs for overfills and other mistakes, regardless of race.

Lastly, the court finds there is no basis for employer liability. Pantoja alleges that "NTN allowed a coworker to repeatedly make derogatory remarks about Hispanics to plaintiff and to plaintiff's Hispanic coworkers without taking any corrective action." Compl., ¶¶ 31, 45. However, the lynchpin for Pantoja's claim is the single statement by Cusimano to a co-worker. In fact, Pantoja admits that he never heard Cusimano use racial slurs prior to, or after this incident. See Def.'s Stmt. of Mat. Facts, ¶¶ 190, 216, 231. The record contains no evidence of severe or pervasive misconduct by any NTN employees, or that Pantoja notified NTN

21

supervisors of this alleged hostile abusive conduct at the plant. See <u>Mason</u>, 233 F.3d at 1043. Absent any knowledge on behalf of NTN, Pantoja cannot satisfy the fourth prong of the hostile work environment claim. See <u>id.</u>

Therefore, because Pantoja cannot satisfy any of the four elements of a hostile work environment claim, summary judgment is proper in favor of NTN.

### III. CONCLUSION

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

ENTER:

_____

CHARLES RONALD NORGLE, SR. Judge

United States District Court

DATED: _12-22-05_